**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
RMP CAPITAL CORP.,

                Plaintiff,

         -against-

BAM BROKERAGE, INC. d/b/a ON THE
EDGE MARKETING, CREATIVE OUTDOOR
DISTRIBUTORS, INC., CREATIVE
OUTDOOR DISTRIBUTORS USA, INC., and
BRIAN HOROWITZ,

                Defendants.
--------------------------------------------------------X
BAM BROKERAGE, INC. d/b/a ON THE
EDGE MARKETING,

                Counterclaim Plaintiff,

         -against-

RMP CAPITAL CORP., RMP TRADE
CREDIT, LLC, RMP MANAGED
RECEIVABLES, INC., and STERLING
NATIONAL BANK,

                Counterclaim Defendants.
--------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
14-CV-881(ADS)(WDW)

<u>**APPEARANCES:**</u>

**Reisman, Peirez & Reisman, LLP**
*Attorneys for the Plaintiff and Counterclaim Defendants RMP Capital Corp.; RMP Trade Credit,
LLC; and RMP Managed Receivables, Inc.*
1305 Franklin Avenue
Garden City, NY 11530
    By:   David H. Peirez, Esq.
           Jerome Reisman, Esq.
           Jennifer Leigh Hartmann, Esq., Of Counsel

**Blakeley & Blakeley LLP**
*Attorneys for the Defendants and Counterclaim Plaintiff*
54 West 40th Street

New York, NY 10018
    By:   David M. Mannion, Esq., Of Counsel

**NO APPEARANCE:**

Sterling National Bank

**SPATT, District Judge**.

On January 27, 2014, the Plaintiff RMP Capital Corp. ("RMP Capital"), commenced this breach of contract action against the Defendants BAM Brokerage, Inc., d/b/a On the Edge Marketing ("BAM"); Creative Outdoor Distributors, Inc. ("Creative I"); Creative Outdoor Distributors USA, Inc. ("Creative II," and together with Creative I, the "Creative Defendants"); CommerceWest Bank ("CommerceWest"); H&H Wholesale Services, Inc. ("H&H Wholesale"), and Brian Horowitz ("Horowitz") in the Supreme Court of the State of New York, Nassau County. Thereafter, on February 9, 2014, the action was removed to this Court based on the complete diversity that existed between the parties.

On February 25, 2014, BAM, the Creative Defendants and Horowitz (collectively, the "Defendants"), filed their Answer, including affirmative defenses. In addition, the Defendants asserted seven counterclaims against RMP Capital, as well as Counterclaim-Defendants RMP Trade Credit, LL ("RMP Trade"), RMP Managed Receivables, Inc. ("RMP Managed Receivables"), and Sterling National Bank ("Sterling").

Also on February 25, 2014, BAM and Creative II filed an unsigned order to show cause directing RMP Capital and RMP Trade (collectively, "RMP") to show cause as to why the Court should not enter a preliminary injunction order

> (1)      requiring RMP [Trade] to provide purchase order financing for all pending orders currently held by BAM [ ] or, alternatively, permitting BAM [ ] to obtain alternate financing for any pending orders or other orders it receives

during the course of this action free and clear of any
security interests held by RMP;

(2)      Requiring RMP [Capital] to make the following
distribution to BAM [ ] from any proceeds received by
RMP from non-party Summit Racing in relation to letter of
credit no.: IMP 00314760: (a) $15,076.00 to Qingdao
Outreach Metal Products Ltd., and (b) $19,710.70 to BAM
[ ] to be applied to payroll and expenses;

(3)      Terminating all UCC financing statements filed by or on
behalf of RMP against Creative [II]; and

(4)      Prohibiting RMP from contacting any customers or lenders
of BAM [ ] or Creative [II] or otherwise interfering with
their trade or financial relationships[.]

(Dkt. No. 14.) The Court signed the proposed order to show cause on February 27, 2014 and

directed the parties to appear the next day, February 28, 2014. However, at the parties' request,

the matter was adjourned to March 7, 2014.

On March 4, 2014, the Court so ordered a stipulation dismissing CommerceWest and

H&H Wholesale from this action without prejudice. As such, BAM, the Creative Defendants

and Horowitz are the only remaining Defendants in this action.

On March 7, 2014 and March 11, 2014, a hearing was held on BAM and Creative II's

request for a preliminary injunction. During the hearing, BAM withdrew its request to require

RMP Trade to provide purchase order financing for all its pending orders. BAM explained that

it was only seeking to obtain alternate financing for its pending purchase orders and that any

goods or proceeds from those pending purchase orders not be subject to RMP Capital's security

interest. At the conclusion of the March 11, 2014 proceedings, the Court reserved decision.

For the reasons set forth below, the motion by BAM and Creative II for a preliminary

injunction is denied. However, the Court notes that all the findings contained in this decision are

made solely for the purpose of resolving BAM and Creative II's motion for a preliminary

injunction.

# I. BACKGROUND

The Plaintiff RMP Capital is an Illinois corporation with its principal place of business located in New York. RMP Capital provides factoring financing to its clients by purchasing their accounts receivable. Counterclaim-Defendant RMP Trade, also an Illinois corporation with its principal place of business in New York, is an affiliate of RMP Capital and provides purchase order financing by advancing funds to its clients based on the existing purchase orders of these clients. RMP Capital and RMP Trade are under common control.

The Defendant BAM is incorporated in California and has its principal place of business in California. BAM's business involves arranging for the manufacturing and importing of finished goods, such as tables, ice box coolers and folding chairs, which it then sells to brand-name domestic wholesalers and retailers. To that end, BAM was licensed to use the mark of several companies, such as the National Basketball Association, Coca Cola and General Motors (collectively, the "Licensors"), on the goods it had manufactured and imported. In exchange, BAM was required to pay license fees and royalties to the Licensors.

On April 16, 2012, with advice from counsel, BAM entered into (1) a Factoring and Security Agreement (the "Factoring Agreement") with RMP Capital and (2) a Purchase Order Financing Agreement (the "Purchase Order Agreement," and together with the Factoring Agreement, the "Agreements") with RMP Trade. In the Factoring Agreement, RMP Capital agreed to purchase BAM's accounts receivable. Specifically, RMP Capital agreed to purchase BAM's unpaid invoices for eighty percent of their face value and then would collect one hundred percent of the invoice value once payment for the invoice was due. Of importance, the Factoring Agreement stated that "[RMP Capital] may, but need not, purchase from [BAM] [ ] Accounts as

4

[RMP Capital] determines to be Eligible Accounts in its sole Discretion . . . . [RMP Capital has no obligation to purchase any Account from [BAM], or to designate and/or commit any funds to the purchase of [BAM's] Accounts." (Davis Decl., Exh. A.) In addition, the Factoring Agreement includes a "choice of law" provision, which provides that "[the] [Factoring] Agreement and all transactions contemplated [under the Factoring Agreement] and/or evidenced hereby shall be governed by, construed under, and enforced with the internal laws of [the State of New York]." (Davis Decl., Exh. A.)

In the Purchase Order Agreement, RMP Trade agreed to provide BAM with purchase order financing so that BAM could purchase goods from its foreign suppliers, which were mainly in China. However, pursuant to the terms and conditions of the Purchase Order Agreement, RMP Trade "could provide [ ] financing [to BAM] in its Discretion." (Davis Decl., Exh. B.) Under the Purchase Order Agreement's "Choice of Law" provision, "[the] [Purchase Order] Agreement and all transactions completed [under the Purchase Order Agreement] and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of [the State of Illinois]." (Davis Decl., Exh. B.)

Both Agreements were executed by BAM in California and hand delivered by BAM to RMP in California. Under the terms and conditions of the Agreements, RMP received a security interest in BAM's then-existing and later acquired assets (the "Collateral"). In this regard, both the Agreements grant RMP "a first priority security interest in the Collateral." (Davis Decl., Exhs. A and B.) RMP have duly perfected their respective security interests.

The Factoring Agreement states that "[n]otwithstanding the creation of this security interest, the relationship of the parties shall be that of Purchaser and Seller of Accounts, and not that of lender and borrower." (Davis Decl., Exh. A.) However, as additional security, Horowitz

executed and delivered a Guaranty Agreement, which stated in relevant part that "RMP has no fiduciary relationship with or duty to [Horowitz] arising out of or in connection with [the Guaranty] Agreement or the indebtedness evidenced hereby and the relationship between [Horowitz] and RMP is solely that of debtor and creditor[.]"  (Guaranty Agreement, pg. 9.)  The Purchase Order Agreement also refers to RMP Trade as the "Secured Party" and BAM as the "Debtor."  (Davis Decl., Exh. B.)

BAM and Creative II claim that the Agreements did not clearly disclose how much interest and/or fees RMP was charging BAM.  However, they assert that RMP Trade's Director of Business Development, Richard Eitelberg ("Eitelberg"), indicated in an email that BAM's interest rate was 3.75 percent per month and, therefore, forty-five percent per annum.

Further, BAM and Creative II allege BAM never received any money from RMP. Instead, they claim that BAM's share of its profits from each transaction was held by RMP as additional security in a "Reserve Account."  According to the Factoring Agreement, the Reserve Account is defined as "a bookkeeping account on the books of [RMP Capital] representing the Purchase Price [defined as eighty percent of the Face Amount of a purchased account, minus the initial fee] which has not been paid by [RMP Capital] to [BAM] maintained by [RMP Capital] to ensure [BAM's] performance of the provisions of this [Factoring] Agreement."  (Davis Decl., Exh. A.)

The Factoring Agreement requires BAM to pay RMP Capital "on demand the amount of any Reserve Shortfall," which is defined as "the amount by which the Required Reserve Account is less than the Required Reserve Amount."  (Davis Decl., Exh. A.)  The Required Reserve Amount is "the Reserve Percentage [twenty percent] multiplied by the unpaid balance of

Purchased Accounts," which are accounts purchased under the Factoring Agreement that have not been closed. (Davis Decl., Exh. A.)

In addition, the Factoring Agreement empowers RMP Capital to (1) "charge the Reserve Account with any Obligation," which is defined as "all present and future obligations owing by [BAM] to [RMP Capital] whether arising [under the Factoring Agreement] or otherwise, and whether arising before, during or after the commencement of any Bankruptcy Case in which [BAM] is a Debtor"; (2) "pay any amounts due [BAM] [under the Factoring Agreement] by a credit to the Reserve Account if there is a Reserve Shortfall"; and (3) "retain the Reserve Account until Complete Termination" of the Factoring Agreement. (Davis Decl., Exh. A.) However, under the Factoring Agreement, RMP was required to "rebate [ ] [BAM] any amount by which the Reserve Account exceeds the Required Reserve Amount by the 15th and the last business Day of each month." (Davis Decl., Exh. A.)

Be that as it may, allegedly, according to BAM and Creative II, RMP Capital had exclusive control over the Reserve Account and was responsible for paying all of BAM's expenses, such as payroll, internet, utilities and rent, directly from the reserve account. Therefore, BAM and Creative II contend that RMP exercised complete control over BAM's finances and BAM had no access to its own funds.

While BAM purportedly received invoices from RMP Capital disclosing how Reserve Account funds were being spent and itemizing those fees that were being charged to BAM during the first few months of their business relationship, BAM and Creative II claim that RMP eventually stopped providing these invoices. As a result, BAM was only able to access information concerning the reserve account by viewing a report on RMP's website. On January

28, 2014, the day after RMP Capital commenced this lawsuit, RMP Capital blocked access to that report.

The January 22, 2014 Reserve Account report indicates that RMP Capital charged BAM thousands of dollars in attorneys' fees. These attorneys' fees included $23,808.86 for RMP Capital's attorneys in this action dating back to March of 2013. Allegedly, there were also charges for unidentified travel and other expenses, including $5,727.74 to Eitelberg, and evidence of double-billing of BAM by Eitelberg in the amount of $1,638.30. BAM and Creative II assert that BAM did not approve of these charges; was not consulted about them; and remains unaware as to their purpose. However, the Court observes that both Agreements contain provisions entitling RMP to charge BAM for attorneys' fees and costs related to enforcing the Agreements, even in disputes with BAM.

BAM and Creative II also allege that RMP Capital was responsible for making the license fee and royalty payments from the reserve account, but stopped doing so in the middle of 2013. As a consequence, BAM lost its valuable licenses and, thus, most of its major customers, as they were only interested in purchasing goods from BAM because BAM's licenses permitted BAM to use the logos of the Licensors. Nevertheless, nowhere in the Factoring Agreement is it suggested that RMP Capital was responsible for making these payments from the Reserve Account or for making them in general.

RMP presents a different version of events. According to RMP, in the fall of 2012, BAM was suffering serious financial difficulties and did not have the funds necessary to make payments to remain operating, including payments under license agreements for defaulted royalty payments; payroll; rent; and utilities. RMP further alleges that while RMP Capital had provided BAM with significant factoring financing, it had yet to be repaid.

Conversely, except for its fees, RMP Trade had been repaid by BAM. This is because (1) the goods it financed reached the United States; (2) an invoice was created; (3) RMP Capital factored the invoices; and (4) BAM used the funding it received from RMP Capital to repay RMP Trade. Concerning those fees owed to RMP Trade by BAM pursuant to the Purchase Order Agreement, RMP Trade assigned its interests to RMP Capital prior to the commencement of this action.

Although RMP Capital's factoring financing was secured by the Collateral, in the event BAM ceased operating, the Collateral would lose substantial value. Therefore, pursuant to Sections 4.3, 13 and 31.1.13 of the Factoring Agreement, RMP Capital agreed to advance additional financing to BAM so that BAM could continue to operate. In this regard, RMP Capital alleges that it advanced financing based upon confirmed purchase orders that had not reached the United States and turned those orders into invoices that RMP Capital could then purchase. In this way, RMP Capital claims that it provided BAM with the funding that BAM needed in order to pay for critical expenses and to stay in business.

RMP Capital also paid other expenses for BAM during BAM's slow season, including amounts due under BAM's license agreements. Nevertheless, according to RMP Capital, it was never under any contractual obligation to provide BAM with this additional funding or to make payments under the license agreements, but only did so to protect the Collateral.

Apparently, despite the financial support from RMP Capital, BAM's business remained in decline. RMP Capital claims that in order to avoid paying the debt it owed to RMP Capital, BAM misrepresented the value of certain invoices to RMP Capital and began to secretly transfer the Collateral from BAM to the Creative Defendants. According to RMP Capital, this alleged conduct breached the Agreements and resulted in several defaults under the Agreements.

On the other hand, BAM and Creative II dispute RMP's allegation, and claim that while both BAM and the Creative Defendants are importers of finished goods, the Creative Defendants are wholly owned, operated and financed by Heather Smulson, who is not a party to this action. They further claim that the only involvement BAM and/or Horowitz has with the Creative Defendants is that Horowitz works in sales for the Creative Defendants. In addition, no contractual relationship exists between the Creative Defendants with either RMP Trade or RMP Capital and neither RMP Trade nor RMP Capital ever provided the Creative Defendants with financing.

However, the Court notes that according to the Certificate of Incorporation for Creative I, it was incorporated in Delaware by Horowitz, not Smulson, using the address 22 Jericho Turnpike, Suite 108, Mineola, NY 11501, which was presumably Horowitz's address. Similarly, according to the Certificate of Incorporation for Creative II, it was also incorporated in Delaware using the address 22 Jericho Turnpike, Suite 108, Mineola, NY 11501. However, the name of the incorporator was Gautam Sanghavi.

In any event, in or around May of 2013, RMP filed Uniform Commercial Code ("UCC") financing statements asserting that it had a security interest in all of Creative II's assets. According to BAM and Creative II, RMP also wrote to CommerceWest and H&H Wholesale, who were two of Creative II's lenders, and falsely advised them that RMP had been granted a security interest in Creative II's collateral. RMP Capital added CommerceWest and H&H Wholesale as Defendants in this lawsuit, although, as stated above, both have since been dismissed from this action. Nevertheless, BAM and Creative II claim that as a result of RMP's actions, CommerceWest ceased financing Creative II and left Creative II unable to pay its bills; facing eviction; and with no choice but to lay off all four of its employees.

Thereafter, in December of 2013, RMP concluded that it was unlikely RMP Capital would be repaid or collect the amounts it had advanced BAM or the fees owed to RMP Trade. It further concluded that continuing to advance financing to BAM would only worsen the alleged $1.5 million indebtedness due to RMP Capital by BAM, which included RMP Trade's fees that had been assigned to RMP Capital. As a result, RMP called BAM in default under the Agreements and ceased providing funding to BAM.

RMP Capital also initiated the instant action, in which it claims that BAM owes approximately $1.5 million dollars. However, BAM and Creative II claim that RMP only advanced $4,034,123.07 to BAM since April of 2012 and collected $3,399,759.72. As such, according to BAM and Creative II, RMP Capital seeks $633,364 in principal, while the remaining balance of $933,170 is for fees and interest.

Prior to the time it moved for a preliminary injunction, BAM has continued to seek financing from RMP Trade, but RMP Trade has refused to provide financing, as it claims it has a right to do under the Purchase Order Agreement. However, at this time, BAM only seeks the ability to obtain alternate financing and asks that the Court subordinate RMP's security interest on any new goods or proceeds resulting from this alternate financing. In this regard, BAM is apparently holding purchase orders from two companies, Aldi and Summit Racing, totaling the sum of $963,932. If BAM can secure alternate financing for these purchase orders, BAM believes it will earn a profit of about $264,000, thus reducing the alleged principal balance owed by BAM to RMP Capital by almost fifty percent.

Further, BAM seeks additional injunctive relief relating to a letter of credit that RMP Trade obtained as payment for one of BAM's suppliers. In this regard, BAM's supplier shipped goods on a letter of credit, but RMP Trade and/or Sterling allegedly refused to honor the letter of

credit when BAM's supplier sought payment. Moreover, according to BAM and Creative II, RMP Capital collected the proceeds for these goods from BAM's customer and has not distributed any of the proceeds to BAM or its supplier. Accordingly, BAM seeks an order compelling an equitable distribution of these proceeds to BAM and its supplier.

Creative II also seeks injunctive relief directing RMP to terminate its UCC statements against Creative II. However, RMP claims that no such UCC financing statements are currently filed against Creative II by RMP. Further, on the record, both parties agreed that this was the case during the March 7, 2014 and March 10, 2014 hearing. As such, the Court finds this aspect of BAM and Creative II's motion for preliminary injunction is now moot and that it need not consider it.

Lastly, BAM and Creative II request an order enjoining RMP from contacting either customers or lenders of BAM and/or Creative II or otherwise interfering with their trade or financial relationships.

## II. DISCUSSION

### A. Legal Standard for a Preliminary Injunction

"A [party] seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." New York Progress and Protection PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)); see also Golden Krust Patties, Inc. v. Bullock, 957 F. Supp. 2d 186, 192 (E.D.N.Y. 2013) (same). A preliminary injunction is considered an "extraordinary" remedy that should not

be granted as a routine matter. Johnson v. Burge, 506 F. App'x 10, 11 (2d Cir. 2012); see also JSG Trading Corp. v. Tray–Wrap, Inc., 917 F.2d 75, 80 (2d Cir.1990).

Generally, the purpose of a preliminary injunction is to preserve the status of the parties until a determination on the merits of the [movant's] claims can be made. Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). However, where, as here, a preliminary injunction is sought to change the status quo, rather than to preserve the status quo, the movant is held to a higher standard of proof. See, e.g., Bronx Household of Faith v. Board of Educ. of City of New York, 331 F.3d 342, 349 (2d Cir. 2003). In this regard, "[a] [party] who seeks a preliminary injunction that will alter the status quo must demonstrate a 'substantial' likelihood of success on the merits." Walsh, 733 F.3d at 486 (citing Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir.2004)). Ultimately, the decision to grant or deny this "drastic" remedy rests in the district court's sound discretion. See American Exp. Financial Advisors Inc. v. Thorley, 147 F.3d 229, 231 (2d Cir. 1998).

**B. As to BAM and Creative II's Motion for a Preliminary Injunction**

**1. Irreparable Harm**

The Second Circuit has defined irreparable harm as "harm to [a party's] legal interests that could not be remedied after a final adjudication." WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 285 (2d Cir. 2012), cert. denied, 133 S. Ct. 1585, 185 L. Ed. 2d 607 (2013). In this regard, "[h]arm may be irreparable where the loss is difficult to replace or measure, or where [a party] should not be expected to suffer the loss." Id. However, "courts may no longer simply presume irreparable harm; rather, [a party] must demonstrate that, on the facts of the case, the failure to issue an injunction would actually cause irreparable harm." Id. (citing Salinger v. Colting, 607 F.3d 68, 82 (2d Cir. 2010)). Specifically, "[c]ourts must pay particular attention to whether the remedies

available at law, such as monetary damages, are inadequate to compensate for the injury." Id. (quoting Salinger, 607 F.3d at 82) (in turn, quoting eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 393, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)) (internal quotation marks and brackets omitted).

RMP argues that any alleged injury facing BAM and Creative II can be satisfied through monetary damages. The Court disagrees at least with respect to BAM's desire to be able to obtain alternate financing. This is because "[t]he 'loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm' that cannot be fully compensated by monetary damages." Red Earth LLC v. United States, 728 F. Supp. 2d 238, 244 (W.D.N.Y. 2010), aff'd, 657 F.3d 138 (2d Cir. 2011) (quoting Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co. of New York, Inc., 749 F.2d 124, 125–26 (2d Cir. 1984)) (internal quotation marks and ellipse in original).

In this case, it is clear that without alternate financing, BAM will be unable to continue functioning as a business. Moreover, it is also clear that BAM is significantly hindered in its ability to obtain alternate financing from another lender because of RMP's first priority secured interest in the Collateral, including any future assets BAM should acquire. As such, "[i]n light of [these] allegations, the Court finds that [BAM] [has] easily satisfied [its] burden of showing a threat of irreparable injury if injunctive relief [allowing BAM to obtain alternate financing free and clear of RMP's security interest] is not granted." Id.

However, as to the second request and fourth request for injunctive relief, the Court is unconvinced that BAM and Creative II have made a showing of irreparable harm. Indeed, in both its memorandum of law and at the hearing, BAM and Creative II failed to make a single argument explaining how they would be irreparably injured if either (1) the proceeds from non-

party Summit Racing were not distributed or (2) RMP was not enjoined from contacting BAM and Creative II's customers and lenders.

Accordingly, since BAM and Creative II have not demonstrated irreparable harm for either the second request or the fourth request for injunctive relief, the Court denies those requests without considering the other requirements for injunctive relief.  See, e.g., Tutor Time Learning Centers, LLC v. KOG Indus., Inc., 1:12-CV-4129 NGG RER, 2012 WL 5497943, at *3 (E.D.N.Y. Nov. 13, 2012) ("Because Tutor Time fails to establish both the irreparable harm and public interest elements, the court does not address the other requirements."); Caldwell Mfg. Co. N. Am., LLC v. Amesbury Grp., Inc., 11-CV-6183T, 2011 WL 3555833, at *6 (W.D.N.Y. Aug. 11, 2011) ("Because the plaintiff has failed to establish that it is subject to irreparable harm if a preliminary injunction is not issued . . .  I decline to consider whether the plaintiff would likely succeed on the merits of its infringement claims; whether the balancing of hardships favors one party or another; or whether the public's interest is served by issuance of preliminary relief.") (citations omitted).

### 2. Likelihood of Success on the Merits

Although the Court has found that BAM will suffer irreparable harm without alternate financing, the Court's inquiry does not end there.  Rather, the Court must move onto the next prong of the analysis: that is, whether there is a clear or substantial likelihood of success on the merits.  Unfortunately for BAM, it cannot satisfy this prong.

In this regard, BAM essentially asks this Court to modify the terms of the Agreements so as to force RMP to subordinate its first priority secured interest in the Collateral with respect to any new goods or proceeds that are financed by an alternate lender.  However, the Agreements clearly give RMP a first priority secured interest in the Collateral and make no exceptions for

15

alternate lenders.  Further, BAM conceded multiple times during the hearing that RMP has not

breached any of the terms or conditions of the Agreements and that these Agreements are valid

and legal.  In addition, it is undisputed that BAM and RMP are sophisticated parties who were

advised by counsel when they entered into the Agreements and who understood the nature of the

terms and conditions of the Agreements.

Nevertheless, BAM argues that it is entitled to relief because it is likely to succeed on the

merits on its fiduciary duty claims and its usury defense.  Specifically, BAM alleges that

(1) RMP Trade had a fiduciary duty to BAM under Illinois State law, which governs the

Purchase Order Agreement, by virtue of the "attorney in fact, or agent" provision in the Purchase

Order Agreement; (2) RMP Trade breached this duty; (3) pursuant to New York State law, which

governs the Factoring Agreement, RMP Capital aided and abetted RMP Trade's breaches of

fiduciary duty to BAM because RMP Capital and RMP Trade are indistinguishable; (3) RMP

Capital owed its own independent fiduciary duty to BAM under New York State Law, which

governs the Factoring Agreement, due to the control it exercises over BAM's finances through

the Reserve Account; (5)  RMP Capital breached this duty; and (6) even though Illinois's usury

law does not apply in this case, New York's strong public policy against usury makes New

York's usury law applicable here with respect to the interest RMP Trade charged BAM under the

Purchase Order Agreement.

As to whether RMP Trade had a fiduciary duty to BAM under Illinois State law, the

Court finds that no such fiduciary duty existed.  In Illinois, "a debtor-creditor relationship is not a

fiduciary relationship as a matter of law."  Pommier v. Peoples Bank Marycrest, 967 F.2d 1115,

1119 (7th Cir. 1992); see also United States v. Mazza-Alaluf, S1 07 CR. 403 PKC, 2011 WL

308266, at *5 (S.D.N.Y. Jan. 27, 2011) ("Illinois does not recognize [a debtor/creditor]

relationship as the basis for a fiduciary duty) (citing R.J. Management Co. v. SRLB Development Corp., 346 Ill. App. 3d 957, 968–69 (Ill. App. Ct. 2004)).

"However, an exception to the rule may pertain if the creditor exercises 'dominion and control' over the debtor." Suarez v. JP Morgan Chase Bank NA, 10-CV-3382, 2011 WL 2149427, at *7 (N.D. Ill. June 1, 2011). "That is, the party attempting to establish the relationship must show 'that he placed trust and confidence in another so that the other gained influence and superiority over him.'" Willmott v. Fed. St. Advisors, Inc., 05 C 1124, 2008 WL 2477507, at *6 n.8 (N.D. Ill. June 17, 2008) (quoting Santa Claus Indus., Inc. v. First Nat'l Bank of Chicago, 216 Ill. App. 3d 231, 159 Ill. Dec. 657, 576 N.E.2d 326, 331 (Ill. App. Ct. 1991)). While "[t]his can be shown by reference [to] factors such as kinship, age disparity, health, mental condition, education, business experience, and extent of reliance[,] [t]he fact that a borrower placed trust and confidence in its lender does not meet this burden." Id.

In this case, the Court finds no reason to depart from the precedent that creditors like RMP Trade do not owe a fiduciary duty to debtors such as BAM under Illinois State law. Indeed, as stated above, RMP Trade and BAM were sophisticated parties engaged in a business relationship. While BAM attempts to construe the "attorney in fact, or agent" provision of the Purchase Order Agreement as somehow creating a fiduciary duty, this provision only provided RMP Trade with the limited power to recover on the purchase orders it financed for BAM. This is not enough to demonstrate that RMP Trade exercised dominion and control over BAM. Therefore, the Court finds that BAM will likely not succeed on any claim that RMP Trade breached its fiduciary duty to BAM, since it appears to the Court that no such fiduciary duty existed.

For these reasons, any New York law claim alleging that RMP Capital aided and abetted RMP Trade in breaching its fiduciary duty will also probably fail. Obviously RMP Capital could not have aided and abetted RMP Trade in breaching its fiduciary duty if RMP Trade never owed BAM such a duty. In this regard, "[u]nder New York law, a claim for aiding and abetting a breach of fiduciary duty requires: (1) *a breach by a fiduciary of obligations to another*, (2) that the [aider or abettor] knowingly induced or participated in the breach, and (3) that [the injured party] suffered damage as a result of the breach." In re Refco Inc. Sec. Litig., 826 F. Supp. 2d 478, 516 n.27 (S.D.N.Y. 2011) (emphasis added). Here, the first element is not met because, as discussed above, RMP Trade did not owe a fiduciary duty to BAM.

With respect to whether RMP Capital owed a fiduciary duty under New York State law, the Court holds that it did not based on the evidence offered in connection with the present motion. "It is well established that absent specific contractual language or circumstances to the contrary, the ordinary relationship between a creditor and debtor does not rise to the level of imposing a fiduciary duty upon the creditor." Gorham-DiMaggio v. Countrywide Home Loans, Inc., 592 F. Supp. 2d 283, 294 (N.D.N.Y. 2008) (collecting cases). Further, "New York courts have rejected the proposition that a fiduciary relationship can arise between parties to a business transaction." Valjean Mfg., Inc. v. Michael Werdiger, Inc., No. 03 Civ. 6185(HB), 2004 WL 1948752, at *4 (S.D.N.Y. Sept. 2, 2004) (quoting Compania Sud-American de Vapores v. IBJ Schroder Bank & Trust Co., 785 F. Supp. 411, 426 (S.D.N.Y. 1992)). Indeed, "[i]n a business arrangement where the parties deal with each other at arms length, such as this one, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." Id. (citations and internal quotation marks omitted).

In the Court's view, no extraordinary circumstances exist here to warrant the finding that RMP Capital owed BAM a fiduciary duty. To reiterate, BAM and RMP Capital were sophisticated parties who agreed to enter into a contractual relationship after receiving advice from counsel. There is no evidence that there was "a relationship of confidence, trust or superior knowledge or control [which would] indicate [ ] a [fiduciary] relationship exists." Banco Espririto Santo de Investimento, S.A. v. Citibank, N.A., No. 03 Civ. 1537(MBM), 2003 WL 23018888, at *16 (S.D.N.Y. Dec. 22, 2003) (quoting In re Mid-Island Hospital, Inc. v. Empire Blue Cross and Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002)).

Nevertheless, BAM tries to suggest that a relationship of control did exist between it and RMP Capital based on the Reserve Account and its theory that RMP Capital had complete dominion over all of BAM's finances and assumed responsibility to pay BAM's expenses. However, according to the language of the Factoring Agreement, the Reserve Account existed not as a tool by which RMP Capital could control BAM's finances or pay expenses on BAM's behalf, but rather was "maintained by [RMP Capital] to ensure [BAM's] performance of the provisions of [the] [Factoring] Agreement." (Davis Decl., Exh. A.)

Moreover, instead of obligating RMP Capital to pay for BAM's expenses, the Factoring Agreement grants RMP Capital authority to charge the Reserve Account for any obligation owed by BAM to RMP Capital. In fact, BAM's own allegations demonstrate that far from creating a fiduciary duty, the Reserve Account existed for RMP Capital's benefit, not BAM's benefit. Indeed, for example, BAM complains that RMP Capital was wrongly charging the Reserve Account for attorneys' fees. However, it appears to the Court that RMP Capital was entitled to charge the Reserve Account for these attorneys' fees pursuant to the Factoring Agreement, which

obligated BAM to pay RMP Capital for all attorneys' fees connected with enforcing the Factoring Agreement.

The Court recognizes that BAM may have needed funds from the Reserve Account to pay its other expenses, including its licensing fees. Nevertheless, this does not change the fact that under the Factoring Agreement, RMP Capital had a right to maintain the Reserve Account for its own protection and to charge the Reserve Account with any obligation that BAM owed to RMP Capital. Further, nothing in the Factoring Agreement suggests that RMP Capital ever agreed to be responsible for paying BAM's expenses or to assume a fiduciary duty, notwithstanding that RMP Capital, in its discretion, provided BAM with some financing for its operating costs.

RMP Capital and BAM "[dealt] at arms length [with one another] in a commercial transaction" and there are no "special circumstances." Bombardier Capital, Inc. v. Naske Air GmbH, No. 02 CV 10176 DLC, 2003 WL 22137989 at *3 (S.D.N.Y. Sept. 17, 2003) (quoting In Re Mid-Island, 276 F.3d at 130). Accordingly, the Court finds that no fiduciary relationship existed between RMP Capital and BAM. Therefore, BAM has not established that there is a substantial likelihood it will succeed on the merits with respect to its breach of fiduciary claim against RMP Capital.

Lastly, BAM contends it has a usury defense that it raises in connection to the fees owed to RMP Trade under the Purchase Order Agreement, which were assigned to RMP Capital. In this regard, BAM asserts that RMP Capital's claims for RMP Trade's fees pursuant to the Purchase Order Agreement are barred under New York's criminal usury law,

"[T]hough N.Y. Gen. Oblig. Law § 5–521(1) [ ] generally exempts corporations from the protection of the civil usury law, § 5–521(3) permits corporations to raise a defense of criminal

usury.  Criminal usury is set forth in N.Y. Penal Law § 190.40 [ ] as the act of knowingly charging "a rate exceeding twenty-five per centum per annum or the equivalent for a longer or shorter period.""  Walter E. Heller & Co. v. Chopp-Wincraft Printing Specialties, Inc., 587 F. Supp. 557, 559 (S.D.N.Y. 1982).

However, under the "choice of law" provision in the Purchase Order Agreement, Illinois State law applies, not New York State law.  "The Illinois usury statute similarly exempts corporations from its protection.  Moreover, the Illinois criminal usury law does not apply to loans permitted by the general usury law."  Id. at 560.  This means that as a corporation, BAM is not permitted to raise a usury defense under Illinois State law.  See Bank of Am., N.A. v. Shelbourne Dev. Grp., Inc., 732 F. Supp. 2d 809, 821 (N.D. Ill. 2010) ("Illinois courts have concluded that the [Illinois Interest Act] "does not apply to transactions involving corporations. . . . [A] corporation has the power to borrow money for its corporate purposes at such rates of interest as the corporation may determine, without regard to the restrictions of any usury law of Illinois.  Consequently, the usury statute does not limit the interest that a corporation may contract to pay on a transaction.") (collecting cases) (citations and internal quotation marks omitted).

BAM argues that despite the choice of law provision in the Purchase Order Agreement, as a matter of public policy, this Court should apply New York State law instead of Illinois State law with respect to the issue of the applicability of its usury defense.  However, such an argument is contrary to previous rulings by courts in this Circuit.  See, e.g., Bentley v. Providian Financial Corp., at *3 (S.D.N.Y. Apr. 21, 2003) ("[The plaintiff's] first claim is that [the defendant] violated New York's criminal usury statute by raising the annual interest on his credit card account to 29.99%.  This claim must fail as [the plaintiff's] credit card agreement is

governed by a New Hampshire choice of law clause, and New Hampshire has no such usury statute. As a general rule, choice of law provisions are valid and enforceable in New York.") (citations omitted); <u>Superior Fnnding Corp. v. Big Apple Capital Corp.</u>, 738 F. Supp. 1468, 1471 (S.D.N.Y. 1990) ("In a diversity action, a court applying New York's choice of law rules will honor the parties' selection of the law that should govern the dispute when the law chosen has a reasonable relationship to the agreement and does not violate public policy. . . . Moreover, New York's 'rule of validation' choice of law rule would favor the forum state whose usury statute would most favorably uphold the contract.") (citations omitted); <u>Walter E. Heller & Co.</u>, 587 F. Supp. at 560 ("In this diversity action, the Court must apply New York's choice of law rules. . . . Under those rules, the parties' selection of governing law should be honored where the law chosen has some reasonable relationship to the agreement, and is not violative of public policy. Here the contract clearly provides that Illinois law shall govern. . . . Nor should Illinois' law be deemed violative of public policy, since usury is not a favored defense, particularly in the circumstances here where a corporation rather than a helpless consumer is involved.") (citations omitted).

Thus, BAM has not demonstrated that there is a substantial likelihood it will succeed on the merits of its usury defense or on any of its fiduciary duty claims. As BAM has not satisfied the likelihood of success on the merits prong of the preliminary injunction test, the Court also denies, as it must, BAM and Creative II's motion for injunctive relief with respect to their first request for relief.

### 3. Balance of the Hardships and Public Interest

The Court has already determined that BAM has not established that it is substantially likely to succeed on the merits. Thus, a preliminary injunction is inappropriate in this case. As

such, the Court need not continue on to examine either the balance of the hardships or the public interest prongs of the preliminary injunction test.  <u>Ascentive LLC v. Opinion Corp.</u>, 842 F. Supp. 2d 450, 478 (E.D.N.Y. 2011) ("Plaintiffs thus have [not] established [ ] a likelihood of success on any of their claims . . . . Consequently, the Court need not address whether the balance of hardships tip decidedly in [the] plaintiffs' favor . . .  or whether an injunction is in the public interest and [the] plaintiffs' motion for a preliminary injunction is denied.") (citation omitted).

### III.  CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, the motion for a preliminary injunction by BAM and Creative II is denied in its entirety.

**SO ORDERED.**
Dated: Central Islip, New York
March 17, 2014


_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge